ARMOUR & COMPANY *v*. RICE.

4-5607 134 S. W. 2d 529

Opinion delivered October 30, 1939.

*J. P. Doyle, R. S. Wilson* and *Hill, Fitzhugh & Briz-zolara,* for appellant.

*Partain & Agee,* for appellee.

HOLT, J. This is an action for damages brought by Jack Rice, a minor, by his mother, Mrs. J. E. Rice, as next friend, and Mrs. J. E. Rice against appellant, Armour & Company, a corporation, and Ruby Rice, in the Crawford circuit court.

The complaint alleged that at the time of the alleged injury to Jack Rice that he and his brother, Ruby Rice, were employees of Armour & Company. The negligence alleged is that Ruby Rice, while employed by appellant company, and in the performance of his duties, and at a time when his brother, Jack Rice, was in a truck with him, as an employee of said company, drove and operated the truck at a dangerous, and high rate of speed, around a curve on highway No. 71 near Hatfield, Arkansas, and on account of such carelessness and negligence of Ruby Rice in so operating the truck, the same left the road, turned over, burned, resulting in injuries to appellee, Jack Rice, and sought damages in the sum of $60,000 on behalf of Jack Rice and for $10,000 on behalf of his mother, Mrs. J. E. Rice.

Defendant, Armour & Company, (appellant here), filed separate answer, denying every material allegation in the complaint and in addition alleged that Jack Rice was a trespasser on the company's truck at the time of

the alleged injury, and any injury received by him was due to his own contributory negligence.

Defendant, Ruby Rice, filed no answer.

Upon a trial to a jury a verdict was returned against both defendants in favor of Jack Rice in the sum of $30,000 and in favor of his mother, Mrs. J. E. Rice, in the sum of $3,000, or a total of $33,000. Appellant, Armour & Company, has appealed.

It is earnestly urged here by appellant (1) that the evidence, as reflected by the record, was not sufficient to go to the jury and warrant any recovery against it; and (2) that at the time of the alleged injury to Jack Rice he was not an employee of appellant; that the relationship of employer and employee and that of master and servant was not present, and, therefore, no liability could attach against appellant, Armour & Company.

The view that we take of this case makes it necessary for us to consider only appellant's second assignment. If appellee, Jack Rice, were not in the employ of appellant at the time of the alleged injury clearly there can be no recovery.

On this question of employment we set out the following testimony:

Jack Rice is the brother of Ruby Rice, the son of Mrs. J. E. Rice, and at the time of the alleged injury was sixteen years of age.

Defendant, Ruby Rice, testified that he had been off a day and on the night before the alleged employment of his brother, Jack, and ". . . I told Mr. Martin I didn't feel good and I had rather not make the trip. Q. What did he say then? A. He just said that I would be loaded and that I would go. . . . Q. What, if anything, did you do after that about obtaining an assistant on that trip? A. That week my wife and I had been staying in Van Buren; and my wife was working at the time and we were staying in Van Buren so mother could take care of the baby during the day and we had been staying over here all that week and I asked my brother the night before that about seven o'clock, I asked him if he would go with me the next day, that I would pay him

for going with me, that I would be paid back by Armour & Company, that I needed somebody to go with me and I asked him that night and we' left the next morning and went over there.''

He further testified that they went to a cafe in Fort Smith; that' he walked around to the plant, the truck was not yet loaded and that he returned to the cafe ''and Jack and I both went around there and by that time they had gotten it finished and I drove the truck out off of the loading dock around to the side of the gas pump and Jack climbed into the truck and Mr. Martin and I put gas in the truck and stood. there and talked.'' This witness also testified that Marion Gordon and Gene Phillips were both inside, that ''Carl Martin is the one who came on the outside.''

As to the actual conversation in reference to taking Jack along, this witness testified: ''Q. Did you say anything to Mr. Carl Martin, the shipping clerk there, about taking Jack with you and who he was? A. I told him he was my brother and I was going to take him with me to help with the load. Q. What did Mr. Martin say with reference to that? A. He said all right. Q. Was that before or after Jack got in the truck? A. I think at that time he was in the truck, he was either standing by it or in it, I am not positive about that. Q. Why did you take him along? A. To help me unload. Q. Did you have anybody's consent or approval? A. I told Mr. Martin that' he was my brother and that I was taking him along to help me unload and he said all right. Q. That was Carl Martin, the shipping clerk? A. Yes, sir.''

And, further in reference to this proposition, he testified: ''Q. Did you on this day when you arranged with your brother, Jack, to go along on this trip request or get any help? A. I didn't feel good that morning, I had been sick a day or two before that; I didn't feel very good and didn't want to be out all day by myself and didn't feel like I could make the run by myself. Q. Had you brought that to. the attention of any employee over there? A. I told Mr. Martin the night before. Q. The man who had charge of sending out the

trucks?. A. Yes, sir. Q. Is that the reason you took Jack along? A. Yes, sir. Q. You needed help? A. Yes, sir. Q. On previous occasions when you had employed someone to go along with you as you stated you had the authority from Mr. Gleason to do and you paid them, state whether or not, if you had been reimbursed by the company for that? A. Yes, sir, I had."

Jack Rice, appellee, testified that his brother, Ruby, on the night before complained of not feeling well and asked him to go with him on the trip, promising that he would pay him, and stated: "We got up at two o'clock and caught a cab and went to Fort Smith and went to the Wide Awake Cafe and then Ruby got up and went around to Armour & Company and then came back, the truck wasn't loaded and then he drank another cup of coffee and then we went around to Armour & Company and went on from there. Q. You went to the plant of Armour & Company on Rogers Avenue? A. Yes, sir. Q. Was the truck there being loaded and being made ready for the trip? A. Yes, sir, when we got there, the truck was being locked up; it was all loaded and they were locking the door. . . . Q. Did Ruby say anything there about your going along? A. The man that had been loading the truck talked to Ruby and Ruby said, 'This is my brother, Jack, and I am taking him along to help me work,' and the man said, 'All right.' Q. Did you know him? A. From the conversation, I took him to be Martin, that is what Ruby called him."

Jack Rice further testified: "Q. Why did you make the trip on this day? A. Ruby said he was feeling sick and didn't feel like making the whole run, he had been out quite a bit late too, but the main thing he offered me two dollars to go along and help. Q. Did you go along for the fun of riding the two hundred miles? A. It's not much fun. Q. You went for the purpose of earning the money that you had been promised? A. Yes, sir. Q. Did you work on that trip? A. Yes, sir. Q. What kind of work did you do? A. I helped Ruby deliver the packages that he had to take into the stores. Q. In what way? A. At places we had to take packages

into the stores, I helped carry them into the stores. Q. Do you know of your own knowledge how many places you made deliveries to that day? A. There were several, well over fifty.''

The above testimony was flatly contradicted in three written statements by Ruby Rice before the trial, one of which was sworn to, and by one written statement of appellee, Jack Rice. However, assuming, as we must, that the jury found this testimony to be true, it is our view that it falls far short of an employment of Jack Rice by Armour & Company, or of creating the relationship of employer and employee and master and servant. In our view the most that can be said of the testimony presented by this record is that at the time of the alleged injury Jack Rice occupied the position of a mere licensee or volunteer.

We think it well settled that before one can claim the status of an employee he must be engaged by another person to perform work or services as directed and controlled by the employer and upon the latter's promise to pay wages, salary, or compensation for such services. There must be a contract between the employer and employee, and a meeting of the minds.

In 1st Labatt on Master and Servant, page 9, an ''employee'' is defined as ''a person employed to do certain work for another under the express or implied terms of an agreement between them, and the master is to have the right to exercise control over the performance of the work, to the extent of prescribing the manner in which it shall be executed.'' Other definitions on the same page of this work are as follows: ''A servant is a person subject to the command of his master as to the manner in which he shall do his work.'' . . . ''The test is this: Whether the person charged is under the control, and bound to obey the orders of the master.'' . . . ''A servant is one who for wages serves his employer, following his directions in performing the work.''

In 18 R. C. L., § 84, pp. 578-9, the author says: ''The fact that the injured person is engaged in the work at the request of an employee does not take his case out of

the rule. If the employee was without authority to bind the employer by the arrangement, the assistant is still no more than a volunteer. Nor is the rule varied by the mere fact that the employer knows of and consents to the arrangement.''

In the case of *Grisson* v. *Atlanta & B. A. L. Ry.*, 152 Ala. 110, 44 So. 661, 13 L. R. A., N. S. 561, the court held (quoting headnote): ''Mere knowledge and consent on the part of a railroad company to the fact that the brother of one who has been employed to keep water in a tank for the use of locomotive has, for a time, assisted in the work, does not charge the railroad company with the duty to him to maintain the machinery in a safe condition, so as to give him a right of action in case of injury by defects in it.'' In the body of the opinion it is stated: ''It is difficult to see how the mere fact that the employee had the intestate aiding him with the knowledge and consent of the master, could amount to an acquiescence on the part of the employer in said intestate's assuming the place of an employee. At best, it could be but a recognition of the fact that said intestate chose to exercise the privilege of a licensee.''

In *Smedley* v. *Mashek Chemical Company*, 189 Mich. 64, 155 N. W. 357, the court held that the burden was upon the plaintiff to show that the relation of master and servant existed between the parties. In that case plaintiff was injured by the breaking of a ladder at a fire after he had been instructed by a Mr. Roberts, foreman of the plant, to climb the ladder and assist with the hose in putting out a fire. He claimed that he so acted in obedience to the request of the foreman. In that case the court held that the relation of master and servant did not obtain and there could be no recovery, and in reversing and dismissing the case said: ''We have examined this record carefully, and are unable to find any evidence that warranted the court in submitting that question to the jury. There is no evidence in the case showing any contract of employment by the defendant, with the plaintiff, and in our opinion the trial court erred in submitting the case to the jury on any such theory.''

On the whole case, it is our view that the trial court erred in refusing to instruct a verdict in favor of appellant, Armour & Company, as a matter of law, and since the case seems to have been fully developed, it will be reversed and dismissed.